### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARILEE C. GLOVER-MOTT, Derivatively and On Behalf of BUMBLE INC., <br><br> Plaintiff, <br><br> vs. <br><br> WHITNEY WOLFE HERD, ANURADHA B. SUBRAMANIAN, ANN MATHER, CHRISTINE L. ANDERSON, R. LYNN ATCHISON, SACHIN J. BAVISHI, MATTHEW S. BROMBERG, AMY M. GRIFFIN, JONATHAN C. KORNGOLD, JENNIFER B. MORGAN, ELISA A. STEELE, PAMELA A. THOMAS-GRAHAM, <br><br> Defendants, <br><br> and <br><br> BUMBLE INC., <br><br> Nominal Defendant. | Civil Action No.:_____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Marilee C. Glover-Mott ("Plaintiff"), derivatively on behalf of nominal defendant Bumble Inc. ("Bumble" or the "Company"), submits this Verified Shareholder Derivative Complaint ("Complaint") against certain officers and directors of the Company (collectively defined herein as the "Individual Defendants"), and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings

submitted by the Company to the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by the Company; (iii) a securities class action lawsuit filed in the United States District Court for the Southern District of New York captioned *UA Local 13 Pension Fund v, Bumble Inc., et. al.*, Case No. 1:22-cv-00624 (the "Securities Class Action") alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, in connection with the Company's secondary public stock offering which took place on or about September 10, 2021 (the "SPO"); and (iv) other publicly available information, including court filings and media and analyst reports, concerning the Company.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of Bumble's officers and members of the Company's Board of Directors (the "Board"). This derivative action arises from the Individual Defendants' breaches of their fiduciary duties of loyalty, candor, and good faith and abuse of their control of Bumble in connection with their causing, approving, and/or acquiescing to Bumble's issuance of false and misleading statements in connection with Bumble's SPO that have caused and continue to cause substantial monetary damages to Bumble and other damages, including damages to its reputation and goodwill.

2.      Bumble Inc. is the parent company and owns the Bumble, Badoo, and Fruitz apps.

3.      Founded by its Chief Executive Officer ("CEO"), Defendant Whitney Wolfe Herd ("Herd") in 2014, Bumble was one of the first dating apps built with women at the center. Badoo, which was founded in 2006, is one of the pioneers of web and mobile dating products. Fruitz, founded in 2017, encourages open and honest communication of dating intentions through playful fruit metaphors.

4.      Bumble is controlled by investment advisory firm Blackstone Group Inc. ("Blackstone") and its affiliates.  At the time of the SPO, Bumble had two series of shares outstanding, its Class A common stock and its Common Units.  Bumble's Class A common stock trades on the NASDAQ under the ticker symbol "BMBL."  Bumble's Common Units are a class of units of Bumble Holdings held by certain pre-IPO (defined below) investors. The Class A common stockholders are entitled to one vote per share while the Common Unit holders are entitled to ten votes per unit.[1]  The SPO offering documents expressly stated that "[i]mmediately following this offering, our Principal Stockholders will hold 93% of the voting power in Bumble Inc."

5.      In February 2021, Blackstone took Bumble public through an IPO in which the Company raised more than $2.4 billion from investors in gross offering proceeds.

6.      Following its IPO, Bumble claimed that it was experiencing significant growth in its paying user count.

7.      However, unbeknownst to investors, during the third quarter of 2021 ("3Q21"), ending September 30, 2021, the Company's previous paying user growth trend had abruptly reversed.

8.      Specifically, Bumble had increased pricing too much on the Bumble app during 3Q21, diminishing the number of paying users willing to sign up for the app.  As to the Badoo app,

---

[1] In addition, a Stockholders Agreement provides defendants Herd and the affiliates of Blackstone (defined below), to which the agreement refers collectively to as Bumble's "Principal Stockholders," certain outsized voting rights entailing that until seven years from the closing of the IPO (or, if earlier, the date the parties to the stockholders agreement intend to enter into in connection with the IPO cease to own in the aggregate 7.5% of the outstanding shares of Class A common stock), each share of Class A common stock held by a Principal Stockholder will entitle such Principal Stockholder to ten votes and each Principal Stockholder that holds Class B common stock will be entitled, without regard to the number of shares of Class B common stock held by such Principal Stockholder, to a number of votes equal to ten times the aggregate number of Common Units (including Common Units issued upon conversion of vested Incentive Units) of Bumble Holdings held by such Principal Stockholder.

during the quarter there was a temporary disabling of third-party payment options on Android by Bumble as it prepared to move payments to its platform, materially impacting the Company's paying user growth and revenue collection. Demonstrating that these were Company-specific problems, Bumble's biggest competitor, Match.com, reported paid user growth during 3Q21, reporting its highest-ever net additions and growing its paying user base by 1.3 million paying users.

9.      Regardless, on or about September 10, 2021, just days before the end of its 3Q21, Bumble undertook the SPO without disclosing the problems plaguing its dating apps or the abrupt slowdown in the Company's paying user growth.

10.     However, in the SPO, unlike the IPO, Bumble did not raise any capital or sell any shares. Instead, the SPO served to unjustly enrich controlling stockholder Blackstone, allowing Blackstone to sell 20.7 million shares of Bumble Class A common stock at $54 per share, generating more than $1.1 billion in gross proceeds.

11.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Bumble has sustained damages as described below.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 on two grounds. First, such jurisdiction exists because Plaintiff's state law claims are dependent on the resolution of substantial questions of federal law. Specifically, Plaintiff alleges that the Individual Defendants breached their fiduciary duties to Bumble and its shareholders by allowing Bumble to violate the federal securities laws. Second, the federal contribution claims asserted herein arise under and pursuant to the provisions of the Sections 10(b) and 21(D) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78(j)(b) and 15 U.S.C. § 78u-4(g). Plaintiff also asserts pendant

common law claims under 28 U.S.C. § 1367. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

13.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

15.     Finally, the Amended and Restated Certificate of Incorporation of Bumble Inc. includes an exclusive forum selection clause which states: "Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by applicable law, be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the federal securities laws of the United States of America, including, in each case, the applicable rules and regulations promulgated thereunder."

## PARTIES

16.     Plaintiff is a current shareholder of Bumble common stock. Plaintiff has continuously held Bumble common stock at all relevant times.

17.     Nominal Defendant Bumble operates online dating and social networking platforms in North America, Europe, and internationally. The Company was founded in 2014 and is headquartered in Austin, Texas.

18.     Defendant Herd was at the time of the SPO, the Founder, CEO, and a director of Bumble.  Due to her beneficial stockholdings and the Shareholder Agreement, defendant Herd, along with Blackstone, was a controlling shareholder of Bumble at the time of the SPO.

19.     Defendant Anuradha B. Subramanian ("Subramanian") was the Chief Financial Officer of Bumble at the time of the SPO.

20.     Defendants Ann Mather ("Mather") has served as the Chair of Bumble's Board since March 2020.  She is the chair of the Nominating and Corporate Governance Committee.

21.     Christine L. Anderson ("Anderson") has served as a member of Bumble's Board since August 2020. She is a Senior Managing Director and the Global Head of Public Affairs and Marketing at Blackstone.

22.     R. Lynn Atchison ("Atchison") has served as a member of Bumble's Board since October 2020. She is the chair of the Audit and Risk Committee.

23.     Sachin J. Bavishi ("Bavishi") has served as a member of Bumble's Board since January 2020. He is a Managing Director in Blackstone's Private Equity Group.

24.     Matthew S. Bromberg ("Bromberg") has served as a member of Bumble's Board since July 2020.

25.     Amy M. Griffin ("Griffin") has served as a member of Bumble's Board since February 2021.

26.     Jonathan C. Korngold ("Korngold") has served as a member of Bumble's Board since January 2020. He is a Senior Managing Director and Global Head of Blackstone's Growth Equity Business, which is focused on providing capital to companies seeking to manage the execution risks associated with high-growth environments. Defendant Korngold is on the Compensation Committee.

27.     Jennifer B. Morgan ("Morgan") has served as a member of Bumble's Board since February 2021. She is the Global Head of Portfolio Transformation and Talent at Blackstone. Defendant Morgan is on the Nominating and Corporate Governance Committee.

28.     Elisa A. Steele ("Steele") has served as a member of Bumble's Board since July 2020. She is on the Audit and Risk Committee, the Nominating and Corporate Governance Committee, and is chair of the Compensation Committee.

29.     Pamela A. Thomas-Graham ("Thomas-Graham") has served as a member of Bumble's Board since August 2020. She is on the Audit and Risk Committee and the Compensation Committee.

30.     The defendants named in ¶¶18-29 are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement (as defined below). The Individual Defendants also solicited investors for the SPO for the benefit of Blackstone and its affiliates, Bumble's controlling shareholder.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

34.     To discharge their duties, the officers and directors of Bumble were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Bumble were required to, among other things:

        a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

        b)      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

35.      Each Individual Defendant, as an executive officer and/or director, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.      The Company has also adopted a Code of Conduct (the "Code"). The Code opens with a statement from Defendant Herd which states, in pertinent part:

Our Code of Conduct is a guide for aligning our actions and decisions with our values and for making sure our business stays ethical and legal. At its core, the message is simple: act with integrity and speak up when you suspect we're not living up to that mark. When we do that, our business will thrive and we will earn the trust of our colleagues, user base, investors, and communities.

37.      The Code goes on to state:

Every one of us must comply with our Code of Conduct no matter our location or position. We also have policies and regulations that hold us to our standards. Bumble's board of directors has adopted the Code, and it applies to every director, officer, and employee of Bumble Inc. and its subsidiaries (collectively, "Bumble"), as well as third parties acting on our behalf. In the case of Bumble's non-employee directors, compliance with this Code is subject to the provisions of Bumble's

amended and restated certificate of incorporation, amended and restated bylaws, and any stockholders agreement with Bumble.

\*      \*      \*

Failing to follow our Code damages our reputation and threatens the strength of our teams and our relationships with our users, investors, and communities.

We take violations seriously and we thoroughly investigate all instances of noncompliance. There are consequences for not following the guidance in our Code and policies, and in some cases a violation could also subject Bumble or individuals to civil and/or criminal penalties.

\*      \*      \*

**Insider Trading and Fair Disclosure**

We never buy or sell securities in Bumble or any other company while in possession of material non-public information or share material, non-public information about Bumble or any other company in connection with buying or selling stock or other securities, which is known as "insider trading" and is illegal. We also must maintain the confidentiality of the sensitive information entrusted to us by Bumble and others with whom we do business.

**Why We Do What's Right**

In the course of our jobs, we may have access to information that is not known to the public. Whether such information belongs to Bumble or another entity, we're careful to preserve our reputation as a company that can be relied on to protect information entrusted to us.

Material, non-public information is information known to us but that has not been widely disseminated to the public, and which a reasonable investor would consider important in deciding whether to buy or sell securities.

Some examples of material information may include:

• Earnings and financial results

• Budgets and planning documents

• News about significant mergers, acquisitions, divestitures, arrangements with distributors, or other commercial transactions

• Major litigation

• Developments regarding Bumble's material intellectual property

• Significant product or partnership developments

• Senior management developments

Insider trading occurs when an individual buys or sells securities while aware of material, non-public information related to those securities or shares material, non-public information with someone else who then buys or sells securities to which such information relates.

Insider trading is a serious crime, punishable by heavy fines and even imprisonment. Our success in the marketplace requires the trust and confidence of the investment community. Sustaining this trust requires that we act with integrity when trading public securities and follow federal and state securities laws.

Bumble is also subject to rules and regulations that prohibit the disclosure of material information to securities analysts and other market professionals before making it available to the public. These rules and regulations require publicly traded companies to previously or simultaneously make public any material, non-public information (oral or written) that a company discloses to the financial community and to shareholders. Bumble may not communicate material, non-public information selectively to analysts or shareholders.

**How We Live Our Code**

We can help prevent insider trading and market abuse by:

• Never buying, selling, or otherwise dealing with stock or other securities of Bumble or any other publicly traded company when in possession of material, non-public information.

• Not disclosing material, non-public information to anyone outside Bumble, including family members, relatives, or friends.

• Sharing material, non-public information, including with fellow team members, only on a need-to-know basis.

• Not engaging in "tipping," which means directly or indirectly passing along material, non-public information about any company to anyone who may trade while aware of such information.

• Never assisting investors or securities analysts with information about Bumble, its competitors, or the industry except if that is clearly part of your job.

• Acknowledging that only certain persons specified in the Policy and Procedures for Compliance with Regulation FD are authorized to communicate information concerning Bumble to investors, securities analysts, and other market professionals.

38.     In addition, the Company's Audit and Risk Committee is specifically tasked with the Board's oversight responsibilities. The conduct of the Audit and Risk Committee is governed by the Audit and Risk Committee Charter (the "Charter").

39.     Pursuant to the Charter:

The Audit and Risk Committee (the "Committee") shall:

A.   Provide assistance to the Board of Directors (the "Board of Directors") of Bumble Inc. (the "Company") with respect to its oversight of:

   (i)    The quality and integrity of the Company's financial statements, as well as oversight of the Company's accounting and financial reporting processes and financial statement audits;

   (ii)   The effectiveness of the Company's control environment, including internal controls over financial reporting;

   (iii)  The Company's compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;

   (iv)   The independent registered public accounting firm's qualifications, performance and independence;

   (v)    The effectiveness of the Company's risk management processes, particularly with respect to financial risk exposure;

   (vi)   The performance of the Company's internal audit function; and

   (vii)  The Company's technology security and data privacy programs.

*       *       *

Review and discuss with management and the independent registered public accounting firm the Company's guidelines and policies with respect to risk assessment and risk management.  The Committee should discuss the Company's major risk exposures, including operational, financial (including the risk of fraud), data privacy and security, legal, regulatory and reputational risks, and the steps management has taken to monitor and control such exposures.

40.     Furthermore, the Board has adopted a set of corporate governance guidelines to promote the functioning of the Board and its committees and to set forth a common set of

expectations as to how the Board should perform its functions (the "Corporate Governance Guidelines").

     41.    The Corporate Governance Guidelines include the following language:

The Board of Directors (the "Board") of Bumble Inc. (the "Company") has adopted these corporate governance guidelines, which describe the principles and practices that the Board is expected to follow in carrying out its responsibilities.  It is expected that these guidelines will be reviewed by the Nominating and Corporate Governance Committee from time to time to ensure that they comply with all applicable laws, regulations and stock exchange requirements.

       *     *     *

The Board directs and oversees the management of the business and affairs of the Company in a manner consistent with the best interests of the Company and its stockholders.  The Board's responsibility is one of oversight, and in performing its oversight role, the Board serves as the ultimate decision-making body of the Company, except for those matters reserved for or shared with the Company's stockholders.  The Board selects and oversees the members of senior management, who are charged by the Board with conducting the business of the Company.

The Board exercises direct oversight of strategic risks to the Company in regular coordination with the Company's management. The Audit Committee reviews guidelines and policies governing the process by which senior management assesses and manages the Company's exposure to risk, including the Company's major financial and operational risk exposures and the steps management takes to monitor and control such exposures. The Compensation Committee oversees risks relating to the Company's compensation policies and practices. The Nominating and Corporate Governance Committee assists the Board by overseeing and evaluating programs and risks associated with Board organization, membership and structure and corporate governance. Each committee charged with risk oversight reports to the Board on those matters.

       *     *     *

In their roles as directors, all directors owe a duty of loyalty to the Company and its stockholders.  Directors must act with integrity in their dealings with and on behalf of the Company and demonstrate a commitment to the Company's values. The Company has adopted a Code of Conduct (the "Code"), which includes a compliance program to enforce the Code, and directors are expected to adhere to the Code.

## SUBSTANTIVE ALLEGATIONS

42.     Nominal Defendant Bumble is an operator of three online dating platforms: (i) the Bumble app; (ii) the Badoo app; (iii) and the Fruitz app.  The Bumble app, launched in 2014, is unique among dating apps because it requires women to make the first move by reaching out to men. Bumble is a popular dating app in the United States, the United Kingdom, Australia, and Canada. The Badoo app, launched in 2006, is popular in Europe and Latin America and is available in 73 countries as of July 31, 2021.

43.     Bumble also offers two types of memberships, free and "Premium."  While all members have access to certain aspects of both of the dating apps, Premium members pay subscription fees and additional fees for certain "Premium Services" that purportedly enhance members' experience on the apps. Selling Premium memberships to "paying users" is how Bumble monetizes its apps.  In 2020, Bumble posted a net loss of $110 million. As such, it is critically important to investors that Bumble continue to grow its paying user base so that the Company can eventually become profitable.

44.     Blackstone, along with its affiliated investment funds, co-owned Bumble prior to its initial public stock offering in February 2021 (the "IPO"), served as sponsors of the Company in the IPO, and remained controlling shareholders of Bumble with defendant Herd following the IPO.

45.     The Company raised more than $2.4 billion from investors in gross offering proceeds through the IPO.

46.     In addition to their roles as members of the Bumble Board, several Individual Defendants were also employed by Blackstone.

47.     For example, at the time of the SPO, defendant Anderson was a senior managing director and the global head of public affairs and marketing at Blackstone; defendant Bavishi was

a managing director in Blackstone's private equity group; defendant Korngold was a senior managing director and global head of Blackstone's Growth Equities Business; and defendant Morgan was a Global Head-Portfolio Transformation & Talent at Blackstone.

48.    Pursuant to the Stockholders Agreement, Blackstone is further entitled to designate a non-voting observer to attend meetings of Bumble's Board. In this regard, Blackstone has appointed Martin Brand, a senior managing director and co-head of U.S. Acquisitions for Blackstone's Private Equity Group, to serve as the non-voting observer. At the time of the SPO, Blackstone and its affiliates continued to beneficially own 45.7% of Bumble's Class A common stock and 23.2% of Bumble's Common Units, providing Blackstone with more than 76% combined voting power over Bumble.

49.    Following its IPO, Bumble claimed that it was experiencing significant growth in its paying user count, announcing that it had had increased 32% year-over-year to 2.69 million by the end of the fourth quarter of fiscal 2020 (ended December 31, 2020), 30% year-over-year to 2.80 million by the end of the first quarter of 2021 ("1Q21") (ended March 31, 2021), and by another 20% year-over-year to 2.93 million by the end of the second quarter 2021 ("2Q21") (ended June 30, 2021). As of June 30, 2021, Bumble reported having 42 million "average monthly users," 2.93 million of which were the all-important "paying users" (1.47 million on the Bumble app and 1.45 million on the Badoo app). In the first and second quarter of 2021, Bumble added over 100,000 paying users each quarter.

50.    However, unbeknownst to investors, during 3Q21, ending September 30, 2021, the Company's favorable paying user growth trend had abruptly reversed.  During the quarter, Bumble had actually lost *over 60,000 paying users* between its two apps. Specifically, the paying user growth the Bumble app had been experiencing tapered off dramatically – growing only from 1.47

15

million paying users to 1.53 million paying users – and the number of paying users on the Badoo app actually ***declined*** from 1.45 million paying users to 1.33 million paying users.

51.     Furthermore, the reasons for the declines were directly related to actions taken by Bumble.  Specifically, Bumble had increased pricing too much on the Bumble app during 3Q21, diminishing the number of users willing to pay for the app.  As to the Badoo app, during the quarter there was a temporary disabling of third-party payment options on Android by Bumble as it prepared to move payments to its platform, materially impacting the Company's paying user growth and revenue collection. Demonstrating that these were Company-specific problems, Bumble's biggest competitor, Match.com, reported its highest-ever net additions and growing its paying user base by 1.3 million paying users during 3Q21.

52.     Despite these adverse facts, on or about September 10, 2021, just days before the end of its 3Q21, the Individual Defendants caused the Company to undertake another registered public stock offering without disclosing the problems plaguing its dating apps or the abrupt slowdown in the Company's paying user growth. Even more troubling, in the SPO, unlike the IPO, Bumble did not raise any capital or sell any shares. Instead, the SPO allowed controlling shareholder Blackstone to sell 20.7 million shares of Bumble Class A common stock at $54 per share, generating more than $1.1 billion in gross proceeds.

53.     On or about September 7, 2021, Bumble filed with the SEC a Registration Statement on Form S-1 for the SPO.  On September 9, 2021, the SEC declared the Registration Statement effective, and on or about September 13, 2021, Bumble filed the final Prospectus for the SPO, which forms part of the Registration Statement (collectively, the "Registration Statement").

54.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements

made not misleading and was not prepared in accordance with the rules and regulations governing

its preparation.

55.     Specifically, the Registration Statement claimed that the Bumble app was "a leader

in the online dating sector across several countries" with "approximately 1.4 million Bumble App

Paying Users during the six months ended June 30, 2021." The Registration Statement also claimed

that the Badoo app "continues to be a market leader" and "had approximately 1.5 million Badoo

App and Other Paying Users during the six months ended June 30, 2021," stating in pertinent part

as follows:

- The Bumble app, launched in 2014, is one of the first dating apps built with women at the center.  On Bumble, women make the first move.  ***Bumble is a leader in the online dating sector across several countries, including the United States, United Kingdom, Australia and Canada.  We believe that because women feel more confident and empowered on our platform, they are more engaged than on other dating apps***.  As a result, we believe that Bumble has one of the highest percentages of women Paying Users among dating apps. According to OC&C Strategy Consultants LLP, UK ("OC&C"), within the North America freemium market, Bumble has approximately 30% more female users for every male user compared to the gender mix of users in the market who do not use Bumble.  ***Additionally, according to OC&C, a higher percentage of Bumble's female users convert to payers than the market average.  We had approximately 1.4 million Bumble App Paying Users during the six months ended June 30, 2021***.

- The Badoo app, founded by Andrey Andreev and launched in 2006, was one of the pioneers of web and mobile free-to-use dating products.  Badoo's mantra of "Date Honestly" extends our focus on building meaningful connections to everyone.  ***Badoo continues to be a market leader*** in Europe and Latin America and is diversified across geographies as a top three grossing iOS lifestyle app in 73 countries as of July 31, 2021.  ***We had approximately 1.5 million Badoo App and Other Paying Users during the six months ended June 30, 2021***.[2]

56.     The Registration Statement also emphasized how Bumble's "total paying users" had

been materially growing leading up to the SPO. For example, the Registration Statement stated that

Bumble had 0.574 million paying users as of December 31, 2018, which had grown to 0.856 million

---

[2]  Unless otherwise noted, all emphasis is added.

paying users as of December 31, 2019, and then to 1.14 million users as of December 31, 2020, and to 1.41 million paying users as of June 30, 2021.  The Registration Statement also stated that Bumble's individual paying user count for its Badoo app had grown from 1.13 million paying users as of December 31, 2018, to 1.19 million paying users as of December 31, 2019, and then to 1.36 million paying users as of December 31, 2020, and to 1.45 million paying users as of June 30, 2021.

57.     Concerning the Company's purported ongoing paying user growth trajectory, the Registration Statement stated that Bumble was a "large, growing and engaged community," stating in pertinent part as follows:

- A Large, Growing, Engaged Community. We have created *a large, growing and engaged community* with approximately 2.9 million average Total Paying Users as of June 30, 2021, *up 24.9% from June 30, 2020*.  ***The sheer scale of our platform creates powerful network effects, with more users on the platform improving selection, which improves user experience and drives even more users to our platform***.

58.     Concerning Bumble's "Growth Strategies," the Registration Statement highlighted the Company's "***Increasing Monetization***" of its online dating apps, noting that while Bumble was "still early in [its] monetization journey," Bumble then "***expect[ed] to increase paying users*** and average revenue per paying user over time."

59.     The statements referenced above in ¶¶55-58 were inaccurate statements of material fact because they failed to disclose the following material facts which existed at the time of the SPO:

- a) that Bumble's paying user growth trends had abruptly reversed in 3Q21 and the Company had actually lost tens of thousands of paying users during the quarter;

- b) that paying users had been more reluctant to sign up for the Bumble app during 3Q21 because of the recent price hike for paid services on the app;

18

    c)   that a material number of paying users were leaving the Badoo app and/or could not make payments through the Badoo app due, in substantial part, to problems arising from the Company's transition of its payment platform; and

    d)   as a result of the foregoing, Bumble's business metrics and financial prospects were not as strong as the Registration Statement had represented.

60.    Under the rules and regulations governing the preparation of the Registration Statement, the Individual Defendants were required to disclose the problems plaguing the Company's Bumble app and Badoo app and the resulting adverse impacts to the Company's paying user base. The Registration Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K, 17 C.F.R. §229.303, and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any "known trends," that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. At the time of the SPO, growth in Bumble's overall paying user count had declined significantly during 3Q21. The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Bumble' profitability, and, therefore, were required to be disclosed in the Registration Statement.

61.    The SPO was successfully completed by the Individual Defendants, enabling Blackstone to sell 20.7 million shares of Blackstone's Bumble Class A common stock to the public at $54 per share, generating more than $1.1 billion in gross proceeds, based on the false and misleading statements alleged above.

62.    On November 10, 2021, Bumble announced its 3Q21 financial results. The Company disclosed that, rather than growing paying users, the Company's total paying user count

had actually declined to 2.86 million, well below the Company's 2.9 million reported paying users as of June 30, 2021, as highlighted in the Registration Statement.

63.     Subsequent to the SPO, the price of Bumble Class A common stock declined substantially.  By the filing of this Action, Bumble Class A common stock traded below $26 per share, a decline of more than 50% from the SPO price ($54 per share).

## DAMAGES TO THE COMPANY

64.     As noted in the 10-Q filed for the 3Q21:

Bumble did not sell any shares of Class A common stock in the offering and did not receive any of the proceeds from the sale. ***Bumble Inc. paid the costs associated with the sale of shares by the Selling Stockholders***, net of the underwriting discounts.

65.     In addition, the Individual Defendants' false and misleading statements as alleged herein, have subjected Bumble to costs and expenses incurred in connection with the defense and/or settlement of the Securities Class Action.

66.     As a direct and proximate result of the Individual Defendants' conduct, Bumble has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67.     Plaintiff incorporates the allegations herein by reference.

68.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

69.     Plaintiff is a shareholder of Bumble, was a shareholder of Bumble at the time of the wrongdoing alleged herein and has been a shareholder of Bumble continuously since that time.

70.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

71.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Bumble Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

72.     At the time of the filing of this complaint, the Board consists of the following eleven individuals: defendants Herd, Mather, Anderson, Atchison, Bavishi, Bromberg, Griffin, Korngold, Morgan, Steele, and Thomas-Graham (the "Director Defendants").

73.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such a demand would have been a futile and useless act with respect to each and every one of the Director Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

74.     The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

75. Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

76. The Director Defendants knowingly and/or recklessly allowed Bumble to make or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Bumble to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to the Director Defendants.

77. Furthermore, the Director Defendants are interested because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling shareholder, at the expense of the Company's public shareholders.

78. The Director Defendants are also incapable of considering a demand to commence and vigorously prosecute this action because they each face additional substantial likelihood of liability as they are all named defendants in the Securities Class Action.

**DEFENDANT HERD IS NEITHER INDEPENDENT NOR DISINTERESTED**

79.     Defendant Herd, the Company's Founder and CEO is not independent. In 2020, Herd received $19,399,545 in executive compensation, which amount is material to her.

**DEMAND IS EXCUSED AS TO DEFENDANTS ANDERSON, BAVISHI, KORNGOLD, AND MORGAN BECAUSE THEY FINANCIALLY BENEFITED FROM THE FALSE AND MISLEADING STATEMENTS AND LACK DISINTERESTEDNESS**

80.     Defendants Anderson, Bavishi, Korngold, and Morgan are all employed by Blackstone, the controlling shareholder of Bumble, and the prime profiteer of the SPO.

81.     The SPO allowed controlling shareholder Blackstone to sell 20.7 million shares of Bumble Class A common stock at $54 per share, generating more than $1.1 billion in gross proceeds.

82.     Moreover, Defendants Anderson, Bavishi, Korngold, and Morgan are unable to impartially consider a demand against one another because of their ongoing business relationships with each other both on the Bumble Board and as employees of Blackstone.

**Demand Is Excused as to Defendants Atchison, Steele, and Thomas-Graham Because as Members of the Audit Committee They Face a Substantial Likelihood of Liability**

83.     Defendants Atchison, Steele, and Thomas-Graham, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowed the Company to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, Defendants Atchison, Steele, and Thomas-Graham were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Defendants Atchison, Steele, and Thomas-Graham, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the

Company, as required by the Audit Committee Charter. For this reason, demand is futile as to Defendants Atchison, Steele, and Thomas-Graham.

**COUNT I**
**BREACH OF FIDUCIARY DUTY AGAINST THE INDIVIDUAL DEFENDANTS**

84.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

85.    The Individual Defendants owed and owe Bumble fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Bumble the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

86.    All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

87.    Each of the Individual Defendants had actual or constructive knowledge that violated their duty of good faith by knowingly causing and/or recklessly allowing the Company to make false and misleading statements and/or fail to disclose that Bumble's growth trend had abruptly reversed at the time of the SPO and as a result, the Individual Defendants caused the Company's Registration Statement to be materially false and misleading at all relevant times.

88.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

89.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Bumble has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company

90.    Plaintiff, on behalf of Bumble, has no adequate remedy at law.

## COUNT II
### FOR FEDERAL CONTRIBUTION AGAINST ALL INDIVIDUAL DEFENDANTS

91.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

92.     All Individual Defendants herein have been named as defendants in the Securities Class Action.

93.     The Individual Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading offering materials.

94.     Although Plaintiff does not adopt the allegations of wrongdoing that are alleged in the Securities Class Action as her own, if the Company is deemed to have violated the federal securities laws, and incurs damages therefore, such damages should not be disproportionately borne by the Company, and these Individual Defendants are liable to the Company for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act.

95.     Accordingly, Plaintiff asserts this claim derivatively for contribution, as provided by statute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Bumble and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.     Directing Bumble to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not

limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-

Laws or Articles of Incorporation and taking such other action as may be necessary to place before

shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the

Board;

   D. Awarding to Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

   E. Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

   Plaintiff hereby demands a trial by jury.


Dated: April 15, 2022        Respectfully submitted,

              **BRAGAR EAGEL & SQUIRE, P.C.**

              */s/ Melissa A. Fortunato*
              Melissa A. Fortunato
              Marion C. Passmore
              810 Seventh Avenue, Suite 620
              New York, NY 10019
              Telephone: (212) 308-1869
              Facsimile: (212) 214-0506
              Email: fortunato@bespc.com
                 passmore@bespc.com

              **HYNES & HERNANDEZ, LLC**
              Michael J. Hynes
              Ligaya T. Hernandez
              101 Lindenwood Drive, Suite 225
              Malvern, PA 19355
              Telephone: (484) 875-3116
              Facsimile: (914) 752-3041
              Email: mhynes@hh-lawfirm.com
                 lhernandez@hh-lawfirm.com